**Phillips & Paolicelli, LLP**
747 3rd Avenue, 6th Floor
New York, New York, 10017
Phone: 212-388-5100; Fax 212-388-5200
Attorneys for Plaintiff
By:  Steven Phillips, Esq.
      Victoria E. Phillips, Esq.
      Melissa Stewart, Esq.
      (*Pro Hac Vice Motion
      to be Submitted*)

**Szaferman Lakind Blumstein & Blader, P.C.**
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08534
Phone: 609-275-0400; Fax: 609-275-4511
Attorneys for Plaintiff
By:  Arnold Lakind, Esq.
      Robert Lytle, Esq.

**Cooney & Conway**
120 N. Lasalle Street, Suite 3000
Chicago, Illinois 60602
Phone:  312-236-6166; Fax 312-236-3029
Attorneys for Plaintiff
By:  Kevin Cooney, Esq. (*Pro Hac Vice
      Motion to be Submitted*)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

NICOLE  BOND,

      Plaintiff,

vs.

SOLVAY SPECIALTY POLYMERS,
USA, LLC; SOLVAY SOLEXIS, INC.;
ARKEMA, INC.; E.I. DU PONT DE
NEMOURS & COMPANY; THE
CHEMOURS COMPANY; THE
CHEMOURS COMPANY FC, LLC;
THE 3M COMPANY; AND JOHN
DOE ENTITIES #1-10,

      Defendants.

CIVIL ACTION NO. _____

**COMPLAINT AND JURY DEMAND**

      Plaintiff, Nicole Bond, by and through her undersigned counsel, and for her Complaint

against Defendants, Solvay Specialty Polymers, USA, LLC, Solvay Solexis, Inc., Arkema, Inc.,

E.I. du Pont de Nemours & Company, The Chemours Company, The Chemours Company FC,

LLC, The 3M Company and John Doe Entities #1-10 (collectively "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action brought by Nicole Bond ("Nicole" "Nicole Bond" or "Plaintiff"). This case seeks to recover damages for personal injuries suffered by Nicole.

2.      Plaintiff, Nicole Bond, suffers from profound and permanent personal injuries and has been required to undergo several medical procedures including, but not limited to:

      a.      Diabetes;

      b.      Interstitial cystitis;

      c.      Colon polyps;

      d.      Acid reflux;

      e.      Anxiety and depression;

      f.      Lymph node resection;

      g.      Gall bladder resection;

      h.      Endometriosis; and

      i.      Loss of the ability to enjoy life's pleasures.

3.      Those injuries were foreseeably caused by Defendants' misconduct, including their intentional manufacturing, use, discharge, and/or disposal of toxic and hazardous chemicals and substances.

4.      These hazardous chemicals include but are not limited to:

      a.      poly- and perfluoroalkyl substances ("PFAS"), (for instance perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and

perfluorooctanesulfonic acid ("PFOS"), as well as their replacement compounds, including but not limited to "GenX").

b.      halogenated hydrocarbons (*e.g.,* Dichloromethane, or Methylene Chloride. Trichloroethylene, Perchlorethylene);

c.      heavy metals (*e.g.,* lead, mercury, arsenic, copper, antimony);

d.      freons;

e.      industrial alcohols and solvents (*e.g.,* acetone, toluene, acetonitrile, ethyl acetate, heptane, hexane, isopropynol, benzene, ethylbenzene, xylene);

f.      numerous mixtures and wastes consisting of multiple compounds, substances and/or products (*e.g.,* paints, dyes, fuels, explosives, ammunition, hereafter collectively "mixtures" or "waste");

g.      polycyclic aromated hydrocarbons ("PAHs"); and

h.      particulate matter and airborne waste.

5.      These substances and other toxins, (hereafter "toxins") individually and in mixtures have the capacity to cause:

a.      adverse reproductive outcomes including infertility, subfertility, prematurity, spontaneous abortion, still birth, birth defects, developmental delays, genetic damage, and embryonic tumors;

b.      malignancies, tumors, and neoplasms including brain cancer, kidney cancer, ovarian cancer, bladder cancer, testicular cancer, breast cancer, pancreatic cancer, colon cancer; and

c.      additional severe non-malignant disorders.

6.      Further, these toxins have the capacity to act in an additive or synergistic fashion such that mixed exposures enhance or even multiply their capacity to inflict and accelerate the harm(s) of the type described above.

7.      In addition, the mechanisms by which these relevant toxins inflict harm are many, and include:

      a.      apoptosis (cell death),

      b.      oxidative stress,

      c.      genotoxicity (spontaneous or *de novo* mutation),

      d.      epigenetic change,

      e.      diminished cellular nourishment,

      f.      impaired cell to cell communication,

      g.      endocrine disruption,

      h.      impaired or excessive immune responses,

      i.      intrauterine growth retardation,

      j.      impaired organogenesis, and

      k.      the capacity to cross placental and brain barriers.

8.      There are no safe levels of exposures to the toxins listed in Paragraph 4, especially with mixed and prolonged exposures.

9.      Further, while exposures to these toxins (*e.g.,* quantum of exposure, duration(s) of exposure and timing of exposure relative to the adverse outcome) typically operate along a biological gradient (dose-response) fashion such that increases in quantum, duration or timing increase the potential for harm, even a single exposure at vanishingly small quanta, unfortunately timed, has the capacity to cause the above described and other injuries. Accordingly, although

the calculation of the precise dose of exposure to each toxins or mixture (and to the aggregate of all exposures) is not presently known, these exposures, from both a qualitative and quantitative perspective, are more than sufficient to have caused Plaintiff's injuries.

10.     As a consequence of Defendants' intentional, knowing, reckless, grossly negligent, and negligent acts and omissions described herein, resulting in the contamination of the water, air, and soil, including but not limited to Plaintiff's water supply, Plaintiff seeks to recover compensatory and punitive damages for the personal injuries suffered by Plaintiff.

## PARTIES

11.     Nicole is an adult citizen of the State of New Jersey, born on November 4, 1978.

12.     Between 1987 and 1988, Nicole resided at and was domiciled at Road # 2, Swedesboro, New Jersey 08085. From approximately 1995 to the present, Plaintiff Nicole Bond resided at and was domiciled at 13 Nortonville Road, Swedesboro, New Jersey 08085.

13.     The external routes of exposure involved airborne dispersion, groundwater, surface water, domestic water supplies, soil contamination, and vapor intrusion in and around the above addresses and adjacent neighborhoods.

14.     Exposures of significance with respect to the etiology of Nicole's injuries and illnesses occurred during the period from one year prior to her conception and continuing through her *in utero* gestation and the time of her birth. However, that is not to say that other exposures are irrelevant to Nicole's injuries and condition.

15.     Defendant Solvay Specialty Polymers, USA, LLC ("Solvay USA") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.  As a limited liability company Solvay USA's citizenship is determined by the citizenship of each of its members. *See, e.g., Zambelli Fireworks Mfg. Co. v.*

*Wood*, 592 F.3d 412, 418 (3d Cir. 2010). Upon information and belief based upon a search of publicly available sources, Solvay USA's sole member is Ausimont Industries Inc. ("Ausimont"), a Delaware corporation. Ausimont is a holding company with no operations. Its headquarters, president, and one of its board members are based in Houston, Texas. Accordingly, Ausimont's principal place of business is Houston, Texas. *See, e.g., Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010); *Johnson v. Smithkline Beecham Corp.*, 724 F.3d 337, 347 (3d Cir. 2013). Thus, Ausimont is a citizen of Delaware and Texas. Solvay USA, in turn, is also a citizen of Delaware and Texas. Neither Solvay USA nor Ausimont are citizens of the same state as the Plaintiff.

16.     Defendant Solvay Solexis, Inc. ("Solvay Solexis") is the predecessor of Solvay USA and was a corporation duly organized under the laws of the State of Delaware with its principal place of business located in Houston, Texas.

17.     Defendants Solvay USA and Solvay Solexis will collectively be referred hereinafter as "Solvay".

18.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business located at 2000 Market Street, Philadelphia, PA 19103.

19.     Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 974 Centre Road, Wilmington, DE 19805.

20.     Defendant The Chemours Company ("Chemours Co.") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 1007 Market Street, Wilmington, DE 19899.

21.     Defendant The Chemours Company FC, LLC ("Chemours FC") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 1007 Market Street, Wilmington, DE 19899.  As a limited liability company, Chemours FC's citizenship is determined by the citizenship of each of its members. See, e.g., *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010).  Upon information and belief based upon a search of publicly available sources, none of Chemours FC's members are citizens of the same state as the Plaintiff.

22.     Defendants Chemours Co. and Chemours FC will collectively be referred hereinafter as "Chemours".

23.     Defendant The 3M Company ("3M") is a corporation duly organized under the laws of the State of Minnesota with its principal place of business at 2501 Hudson Road, Maplewood, MN 55144.

24.     Defendants John Doe Entities #1-10 are fictitious names of corporations, companies, partnerships, or other business entities or organizations whose identities cannot be ascertained as of the filing of this Complaint, some of which are successors to, predecessors or alter egos of, or are otherwise related to, the identified Defendants in this matter or which are otherwise liable pursuant to the causes of action set forth herein.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 since no Plaintiff is domiciled in the same state as any Defendant and the amount in controversy exceeds $75,000.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the claim occurred in this District.

## STATEMENT OF FACTS

27.     Plaintiff suffers from profound personal injuries described in Paragraph 2 above.

28.     These injuries were all proximately caused by the Defendants' misconduct, including their intentional manufacturing, use, discharge, and/or disposal of toxic and hazardous chemicals including, but not limited to, the hazardous chemicals described in paragraph 4 above.

29.     With respect to the PFAS, PFOA PFNA and PFOS chemicals[1], the United States Environmental Protection Agency ("EPA") has identified 3M as the dominant global producer of PFOA and related chemicals.

30.     3M manufactures at least eighty-five (85%) percent of total worldwide volumes of PFOA and related chemicals.

31.     Poly- and perfluoroalkyl substances ("PFAS") are man-made chemicals.

32.     PFAS have been manufactured and used in the United States since the 1940s.

33.     PFAS have fire-resistant properties.

34.     PFAS act as oil, grease, and water repellants.

35.     PFAS have been used to make many household products such as Teflon®, Gore-Tex® Stainmaster®, Scotchgard®, and Tyvek®.

36.     PFAS compounds are a substantial threat to the environment and human health.

37.     Some PFAS have been classified as carcinogenic.

38.     Studies report that PFAS exposure  and exposures to the other toxins have the capacity to cause *inter* alia:  testicular cancer, kidney cancer, liver cancer, brain cancer, lymphomas, leukemia, breast cancer, lung cancer, autoimmune disorders, endocrine disorders,

---

[1]Poly- and perfluoroalkyl substances ("PFAS"), whose compounds include perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and perfluorooctanesulfonic acid ("PFOS"), and their replacement compounds, including but not limited to "GenX".

developmental and genetic defects to fetuses, developmental defects to breastfed babies, reduced vaccine response, neurological damage, central nervous system damage, cognitive impairment, increased cholesterol, and increased liver enzymes and a host of other disorders including those suffered by Plaintiff.

39.     PFAS compounds and certain other toxins are resistant to degradation.

40.     PFAS compounds and certain other toxins persist indefinitely in the environment.

41.     PFAS compounds and certain other toxins or their metabolites bioaccumulate in living tissue.

42.     People who consume PFAS and other toxins via drinking water and are otherwise exposed accumulate increasing concentrations of PFAS and other toxins or their metabolites in their blood.

43.     For decades, Defendants and their predecessors in interest have known (or should have known) of the highly toxic characteristics of PFAS and other toxins.

44.     The New Jersey Department of Environmental Protection ("NJDEP") has devoted time to investigating and is continuing to identify and investigate the presence of PFAS and other toxins in New Jersey's environment, as well as to monitor, treat, clean up, and/or remove PFAS or other toxins in impacted areas.

45.     Chemicals including but not limited to "GenX" have been substituted by Defendants in lieu of their PFAS chemicals.

46.     These replacement chemicals are being inaccurately described as short-chain and having shorter half- lives.

47.     These replacement chemicals do not break down in the environment.

48.     They have also been detected in drinking water, groundwater, and surface waters.

49.     In 2009, EPA issued preliminary health advisory values for PFOA and PFOS in drinking water of 400 parts per trillion ("ppt") and 200 ppt, respectively.

50.     In 2016, EPA lowered its advisories for PFOA and PFOS to 70 ppt collectively total in further recognition of their extreme danger at even the most miniscule doses.

51.     In 2018 the United States Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released draft minimum risk levels of 21 ppt for PFOA and PFNA, and 14 ppt for PFOS.

52.     The NJDEP has adopted a specific groundwater Quality Standard ("GWQS") of 10 ppt for PFNA and a Maximum Contaminant Level ("MCL") of 13 ppt.

53.     The NJDEP added PFNA to its List of Hazardous Substances on January 16, 2018.

54.     On March 13, 2019, the NJDEP established interim specific groundwater quality criteria for PFOA and PFOS of 10 ppt.

55.     The NJDEP has proposed adding PFOA and PFOS to the List of Hazardous Substances.

56.     The NJDEP also issued a Statewide PFAS Directive, Information Request and Notice to Insurers against Defendant Solvay Specialty Polymers USA, LCC, Defendant Solvay Solexis, Inc., Defendant E.I. du Pont de Nemours & Company, Dowdupont, Inc., DuPont Specialty Products USA, LLC, Defendant The Chemours Company FC, LLC, Defendant The Chemours Company, and Defendant The 3M Company "to notify them that the Department believes them to be responsible for the significant contamination of New Jersey's natural resources, including the air and waters of the State, with poly- and perfluoroalkyl substances ("PFAS")…" which encompass the air and water utilized by plaintiff. Attached hereto as **Exhibit**

A is a true and correct copy of the NJDEP Directive.  The allegations of Exhibit A are incorporated herein.

57.     The other toxins have also been the subject of repeated governmental evaluation and regulation by agencies of the federal government, the State of New Jersey, other state governments, and foreign regulatory bodies. Defendants are believed to have violated such regulations at relevant times and in relevant localities.

**I.     Solvay and Arkema's West Deptford Facility**

58.     Solvay has been the owner and operator of a manufacturing facility located at 10 Leonard Lane, West Deptford, NJ 08085 ("the West Deptford facility") from 1990 to the present.

59.     Before 1990, Arkema owned and operated the West Deptford facility.

60.     Solvay manufactured polyvinylidene fluoride ("PVDF"), which is another PFAS compound, at the West Deptford facility.

61.     PVDF is a specialty plastic used in conjunction with lithium batteries, medical and defense uses, semi-conductors, or other instances when a higher level of purity is required.

62.     On information and belief, Arkema manufactured PVDF and other high-performance materials at the West Deptford facility prior to 1990.

63.     Solvay's West Deptford facility was considered to have the second highest capacity in the world for purposes of using Surflon S-11 to make PVDF, which is composed of approximately 74% PFNA.

64.     In connection with its operations, Solvay recklessly released vast amounts of PFNA and other toxins into the surrounding air, soil, and water contaminating the site, off-site properties including Plaintiff's, and New Jersey's natural resources with PFNA.

65.    At relevant times, Solvay also used sodium perfluorooctanoate (NaPFO) as a surfactant at the West Deptford Facility, which was supplied to it by 3M.

66.    NaPFO degrades into PFOA.

67.    As a result of its operations, Solvay recklessly, and with actual malice or wanton disregard of the health of Plaintiff and others, released vast amounts of PFOA into the surrounding air, water, and soil contaminating the site, off-site properties including Plaintiff's and New Jersey's natural resources with the PFOA chemical.

68.    Prior to 1990, and at relevant times, as a result of their operations, Arkema recklessly, and with actual malice or wanton disregard of the health of Plaintiff and others, released massive amounts of PFOA into the surrounding air, soil and water contaminating the site, off-site properties including Plaintiff's, and New Jersey's natural resources with PFOA and other relevant toxins.

**II.    DuPont and Chemours' Chamber's Works Facility**

69.    For over a century, from 1891 to 2015, DuPont owned and operated Chambers Works, 67 Canal Road and Route 130, located in Pennsville and Carneys Point Townships, New Jersey.

70.    DuPont produced, used, and recklessly discharged into the environment approximately 1,200 separate chemicals, pollutants, and other hazardous substances from the Chambers Works facility. Upon information and belief, in addition to the PFOA/PFAS chemicals, many, if not most of the other toxins discussed above were also wrongfully produced, used and recklessly discharged into the environment from this facility.

71.    PFOA was used at Chambers Works beginning in the late 1950s to, among other things, manufacture fluoroelastomers, perfluoroelastomers, and specialty fluoroelastomers used

in a variety of consumer and other products for their chemical non-stick and heat-resistant properties.

72.     Telomers were used and manufactured at Chambers Works.

73.     PFOA is a by- product of the telomer manufacturing process.

74.     At relevant times, 3M supplied DuPont with PFOA.

75.     DuPont also accepted large quantities of PFOA-containing waste from off-site facilities and discharged this and other toxic waste along with wastewater from its on-site PFOA-related processes through its wastewater treatment plant.

76.     As a result of its operations, for decades, DuPont recklessly released massive amounts of PFOA as well as other PFAS, including PFNA, and other toxins from Chambers Works into the surrounding air, water and soil, contaminating the site, off-site properties including Plaintiff's, and New Jersey's natural resources.

77.     In 2015, DuPont transferred its Chambers Works facility to Chemours.

78.     DuPont continued to operate at the location pursuant to an industrial lease through which DuPont was the tenant and Chemours FC was the landlord.

79.     Chemours accepted the transfer of DuPont's Chambers Works facility with the knowledge that the site had been wrongfully contaminated with PFAS and other toxic substances.

80.     Chemours accepted the transfer of DuPont's Chambers Works facility with the knowledge that it was recklessly discharging PFAS and other toxins into the surrounding air and water contaminating off-site properties including Plaintiff's, and New Jersey's natural resources.

81.     Sampling of residential drinking water wells in the surrounding area revealed contamination at least five miles away from the Chambers Works facility with a substantial

number of wells exceeding applicable screening criteria for concentrations of PFOA, PFNA, or PFOA and PFOS combined.

82.     The NJDEP has declared that: "DuPont has not been working in good faith to address the contamination it released into New Jersey's environment. Instead, DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its 'performance chemicals' business (including its PFAS-related product lines), the [Chambers Works facility] itself, and the associated liabilities to Chemours [Co.] and Chemours FC and away from DuPont (and tens of billions of dollars of its assets). DuPont has concealed from the Department and the community the extent and nature of the environmental injuries its contaminants caused."

83.     NJDEP also declared that "[b]oth DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey."

84.     DuPont and 3M committed acts and omissions with respect to PFAS and other toxins with actual malice and/or with a wanton and willful disregard of people who foreseeably might be harmed by those acts or omissions.

85.     This conduct was performed with greed and in callous disregard of the public health as well as Plaintiff's health and well-being, in order to maximize profit, avoid necessary expense, to promote sales of their products, and to reduce or eliminate their obligations to otherwise remediate or prevent the discharge of PFAS into the environment and Plaintiff's private wells.

### III.   Defendants' Contamination of Groundwater, Surface Water, Drinking Water, Air and Soil

86.     For decades, Defendants knew or should have known of the severe and adverse health and environmental effects and impacts of PFAS and other toxins.

87.     Despite that knowledge, Defendants continued to use PFAS and other toxins in products and release them into the environment.

88.     From as early as the 1970s, Defendant 3M knew that PFOA and PFOS and other toxins were harmful to people and the environment based on its own studies and review of relevant scientific and medical literature.

89.     Defendant 3M knew that PFAS and other toxins had the capacity to and foreseeably would leach into groundwater and contaminate the environment.

90.     As early as 1960, an internal 3M memo admitted that its chemicals "[would] eventually reach the water table and pollute domestic wells."

91.     3M intentionally and wantonly sought to suppress scientific research on the hazards associated with PFAS products and other toxins.

92.     3M intentionally mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and environmental risks of its PFAS products and other toxins.

93.     At least one scientist funded by 3M reported his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

94.     From studies of its own workers, Defendants DuPont knew that PFOA and other toxins were harmful to humans both alive and *in utero*.

95.     Defendants DuPont knew that PFOA and other toxins were being discharged into the environment, including the air, soil, groundwater, surface water and drinking or household water supply.

96.     Defendants DuPont failed to disclose the risks to regulators, the public or Plaintiff.

97.     In a 2003 report on Chambers Works, DuPont disclosed that PFOA was present in groundwater throughout the facility and at the perimeter at a concentration up to 46,000 ppt.

98.     However, DuPont falsely characterized those results as showing "very low levels" and that "PFOA is being contained on-site by the site groundwater containment system."

99.     Since at least 1991, Defendants Solvay knew that it was discharging large amounts of PFNA and other toxins into the environment from their West Deptford, New Jersey facility located at 10 Leonard Lane, West Deptford, NJ 08086.

100.    In 2006, the NJDEP conducted its first statewide occurrence study of PFAS in drinking water.

101.    That study revealed that 65% of sampled drinking water sources had PFOA compounds present, and 30% had PFOS compounds present.

102.    In the samples tested, PFOA was detected at a concentration up to 100 ppt, PFOS was detected up to 43 ppt, and PFNA was detected up to 96 ppt.

103.    NJDEP sampled 992 private wells as of June 2018 for PFAS and detected the following:

a.  PFOA in 427 wells (43%) with 284 of those wells having levels of PFOA exceeding the proposed MCL for PFOA; and

b.  PFOS in 304 wells (31%) with 40 of those wells having levels of PFOS exceeding the proposed MCL for PFOS.

104.    400 of those sampled wells were sampled as part of the remedial investigation emanating from Solvay's West Deptford facility.

105.    Studies show that exposure to PFAS have the capacity to cause *inter alia* testicular cancer, kidney cancer, liver cancer, autoimmune disorders, endocrine disorders, genetic damage, developmental birth defects to fetuses, developmental defects to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

106.    The routes of exposure to which Plaintiff was exposed to the relevant toxins include: a) the ingestion of drinking water, b) the inhalation of vapors and particulate matter, and c) dermal contact and skin absorption. Plaintiff was exposed, *in utero* and at the time of conception, to the relevant toxins and their metabolites which were present in Plaintiff's mother's body and also present in Plaintiff's father's body and particularly in his sperm and seminal fluid. Plaintiff was also exposed to these toxins or their metabolites as an infant and throughout Plaintiff's life.

107.    Defendants' negligent, wanton and willful misconduct, (both individually and collectively) and the resulting wrongful exposures, proximately caused Plaintiff's injuries and damages as described above.

108.    As a consequence, each Defendant is individually and jointly and severally liable to Plaintiff for both compensatory and punitive damages.

### CLAIMS

### Count I: Negligence

### Plaintiff v. All Defendants (Including John Doe Entities #1-10)

109.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

110.    Defendants knew or should have known that the use of PFAS and/or discharge of PFAS and other toxins into the air, soil, groundwater and drinking or household water are hazardous to human health and the environment.

111.    Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS and other toxins into the environment in close proximity to surrounding residential communities, including Plaintiff's residence(s).

112.    Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 had a duty to take all reasonable measures to ensure that PFAS and other toxins would be effectively contained and not discharged into the surrounding environment.

113.    Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 had a duty to operate and manage their facilities and the related wastes in such a way as to not create a nuisance or dangerous condition that could cause injury or damage to human health and the environment.

114.    Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 further had a duty to ensure that the manufacturing processes that they chose to employ did not unreasonably endanger the drinking water relied upon by residents in the surrounding community, including Plaintiff's residence(s).

115.    Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 breached the above-stated duties by unreasonably disposing of PFAS and other toxins in a manner which made it foreseeable that they would enter the environment, specifically but not limited to the groundwater, exposing nearby residents, including Plaintiff, who relied upon the groundwater for their drinking and household water supply.

116.     Defendant 3M had a duty to warn users of their PFAS and other relevant products of the dangers of releasing PFAS and other relevant toxins into the environment.

117.     Defendant 3M breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers such as Defendants Solvay, Arkema, DuPont, Chemours, and John Doe Entities #1-10, to avoid discharging PFAS and other relevant toxins into the environment where it was likely to enter the environment including the soil, air, and water including groundwater and be inhaled, absorbed and/or ingested by residents including Plaintiff in surrounding communities.

118.     Defendant 3M further breached a duty by neglecting to inform itself of the improper manner in which its purchasers, including the other Defendants mishandled highly toxic 3M products.

119.     As a direct and proximate result of these acts and omissions, Defendants individually and collectively wrongfully caused the environment to be contaminated with PFAS and other toxins, thereby exposing Plaintiff to these chemicals and substances, and causing injury to Plaintiff as described above.

120.     All Defendants contributed to the contamination of the environment with PFAS and other harmful substances, and all subsequently contributed to Plaintiff's exposure to these chemicals, thereby causing injury to them.

121.     The acts and omissions of Defendants were negligent, and as a result, Plaintiff has suffered and/or will in the future suffer damage in the form of bodily injuries, emotional distress, economic loss, medical expenses and was otherwise damaged, for which Defendants are liable.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants, jointly and severally, for compensatory, non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count II: Gross Negligence and Recklessness

### Plaintiff v. All Defendants (Including John Doe Entities #1-10)

122.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

123.    At all relevant times, Defendants, as detailed above, committed acts and omissions with respect to PFAS and other toxins with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions and/or with gross negligence.

124.    Specifically, Defendants wantonly and willfully caused, permitted, and allowed the release of PFAS and other toxins into the environment including the air, water, and soil, including the drinking water of Plaintiff, constituting a want of care and a conscious indifference to the rights, welfare, safety, and health of Plaintiff, such that Defendants' acts constitute gross negligence or reckless, willful or wanton misconduct.

125.    Such conduct was motivated by greed in an effort to maximize profit with disregard to their duties and responsibilities to the public and to Plaintiff.

126.    All Defendants contributed to the contamination of the environment with PFAS and other toxins, and all subsequently contributed to Plaintiff's exposure to these chemicals, thereby causing injury to Plaintiff.

127.    Defendants' conduct involved deliberate acts or omissions with knowledge of a high degree of probability of harm to the Plaintiff and an attendant reckless indifference to Plaintiff's health, safety, and welfare.

128.    Defendants' conduct demonstrated a willful and wanton, malicious and reckless disregard of the rights of Plaintiff so as to warrant the imposition of punitive damages.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants jointly and severally, for compensatory, non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

## Count III: Private Nuisance

### Nicole Bond v. Solvay, Arkema, DuPont, Chemours & John Doe Entities #1-10

129.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

130.    Defendants' acts and omissions with respect to the release of PFAS and other toxins in the environment resulted in the contamination of the air, soil, and water, including but not limited to Plaintiff's water supply, and have thus unreasonably interfered with Plaintiff's use and enjoyment of Plaintiff's property, invading the home and body of Plaintiff.

131.    Defendants' acts and omissions with respect to the release of PFAS and other toxins has made Plaintiff's water supply unfit for consumption and other domestic purposes.

132.    Defendants' unreasonable interference with the use and enjoyment of Plaintiff's property constitutes a continuous invasion of Plaintiff's rights.

133.    Defendants, Solvay, Arkema, DuPont and Chemours all contributed to the contamination of the environment with PFAS and other toxins, and all substantially contributed to a private nuisance on Plaintiff causing Plaintiff's injuries and damages as stated above.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants jointly and severally, for compensatory, non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count IV: Public Nuisance

### Nicole Bond v. Solvay, Arkema, DuPont, Chemours & John Doe Entities #1-10

134.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

135.    Defendants' conduct detailed above unreasonably interfered with a right common to the general public, including the public's right to be free from environmental contamination in the air it breathes and water it drinks, and in which its members bathe, shower, and swim.

136.    Defendants' conduct detailed above unreasonably and significantly interfered with the public health and public safety by contaminating water, soil, and air with toxic and carcinogenic chemicals.

137.    Defendants' conduct was of a continuing nature, and/or produced a long-lasting effect, and Defendants knew and/or had reason to know that it would have a significant effect on the public's rights.

138.    Plaintiff suffered harm of a kind different from that suffered by other members of the public exercising rights common to the general public.

139.    Defendants' acts and omissions with respect to the release of PFAS and other toxins in the environment including the air, soil, and water resulted in the contamination of Plaintiff's home and water supply and injuries and damages as set forth above.

140.    Defendants' unreasonable interference with the use and enjoyment of Plaintiff's property constitutes a continuous invasion of Plaintiff's rights.

141.    Defendants, Solvay, Arkema, DuPont and Chemours all contributed to the contamination of the environment with PFAS and other toxins, and all subsequently contributed to the public nuisance imposed on Plaintiff.

142.    Defendants' creation of a continuing public and/or private nuisance has damaged Plaintiff in the form of bodily injury, emotional distress, and other damages all of a type not common to the general public, for which Defendants are liable.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants jointly and severally, for compensatory, non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count V: Past and Continuing Trespass

### Nicole Bond, v. Solvay, Arkema, DuPont, Chemours & John Doe Entities #1-10

143.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

144.    As related above, Plaintiff is and has been the owner(s) and/or possessor(s) of real property and reside or resided on those properties.

145.    Defendants negligently, recklessly, and/or intentionally failed to properly control, apply, use and/or dispose of PFAS and other toxins resulting in their discharge into the environment entering, invading, intruding, and injuring the rights of Plaintiff to possess and enjoy her properties.

146.    Plaintiff has not consented and does not consent to the contamination alleged herein, and Defendants knew or reasonably should have known that Plaintiff would not consent to such.

147.    Defendants, Solvay, Arkema, DuPont and Chemours, all contributed to the contamination of the environment with PFAS and other toxins, and all subsequently contributed to the past and continuing trespass imposed on Plaintiff.

148.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, the soil and drinking water wells servicing the Plaintiff's properties have been contaminated with PFAS, and other toxins, causing significant personal injuries and damage, including actual, consequential, and nominal damages as described above.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants jointly and severally, for compensatory, non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count VI: Strict Liability (Abnormally Dangerous Activities)
### Plaintiff v. Solvay, Arkema, DuPont, Chemours, 3M & John Doe Entities #1-10

149.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

150.    At all relevant times, Defendants Solvay, Arkema, DuPont, Chemours, 3M and John Doe Entities #1-10 either sold, disposed of, discharged, and emitted hazardous substances from their facilities which they owned, controlled, and operated.

151.    As a result of Defendant 3M selling and Defendants Solvay, Arkema, DuPont, Chemours and John Doe Entities #1-10 discharging such substances from their sites, the groundwater under Plaintiff's property and the air breathed by Plaintiff were contaminated with hazardous substances, creating actual harm to Plaintiff.

152.    The manufacturing, utilization, disposal, and discharge of PFAS and other toxins constitute abnormally dangerous activities that introduce an unusual danger in the community.

153.    Defendants' activities in selling, manufacturing, utilizing, disposing, and discharging of these products presented a high degree of risk of harm to the person, land, and/or chattels of others.

154.    It was likely that the harm resulting from Defendants' activities would be great.

155.    The exercise of reasonable care does not eliminate the risk of harm posed by Defendants' activities.

156.    Defendants' activities are not a matter of common usage in the areas in which they were carried out.

157.    Defendants' activities were inappropriate to the locations in which they were carried out.

158.    The dangerous attributes of and risk posed by Defendants' activities outweighed their value to the community.

159.    The manufacturing, utilization, disposal, and discharge of these products are not matters of common usage in the areas where these activities were carried out.

160.    At all relevant times, the risk of the Defendants' abnormally dangerous activities outweighed the value to the community.

161.    Defendants' acts and omissions in selling, manufacturing, utilizing, disposing, and discharging hazardous chemicals proximately caused the contamination to Plaintiff's properties and injuries and damages to Plaintiff, making Defendants strictly liable for the harm caused by such contamination.

162.    Defendants Solvay, Arkema, DuPont, 3M and Chemours all foreseeably contributed to the contamination of the environment with PFAS and other toxins, and all

subsequently contributed to Plaintiff's exposure to these chemicals, thereby causing injury and damages to them as set forth above.

163.   As a direct and proximate result of Defendants' discharges of hazardous substances and contaminants, Plaintiff has and will continue to suffer damages.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants, jointly and severally, for compensatory, non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count VII: Strict Liability (Failure to Warn)

### Plaintiff v. 3M & John Doe Entities #1-10

164.   Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

165.   Defendant 3M developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied PFAS and other toxins for sale and sold such products to Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 in the ordinary course of their businesses.

166.   Upon information and belief, Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 utilized the PFAS chemicals and other toxins supplied by Defendant 3M in a reasonably foreseeable and intended manner.

167.   The PFAS and other toxins sold by Defendant 3M were unreasonably dangerous to residents of surrounding communities, including Plaintiff, without adequate warnings and instructions to prevent the discharge of PFAS and other toxins into the environment and accumulation inside the bodies of residents in surrounding communities, including Plaintiff.

168.    Defendant 3M knew or should have known that the PFAS and other toxins they sold would be discharged into the environment and cause contamination of the water supply of residents and accumulation in the blood serum and bodily tissues of residents living in the surrounding communities, including Plaintiff.

169.    Defendant 3M failed to advise Plaintiff as well as Defendants Solvay, Arkema, DuPont, Chemours, and John Doe Entities #1-10 which were purchasers or users of PFAS and other toxins, or those foreseeably exposed to their PFAS and other toxins, about the risks these products posed to foreseeable third parties, such as Plaintiff, and about techniques that could be employed to reduce or eliminate these risks.

170.    Defendant 3M had actual knowledge of the health hazards associated with PFAS and other toxins through both animal studies conducted by researchers employed or contracted by such Defendant and though experience with Defendant's own workers, but, upon information and belief, failed to share such information with purchasers, users or those foreseeably exposed to their products, including Plaintiff and Defendants, DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10, or with governmental agencies.

171.    Defendant 3M acted with reckless indifference to the health and safety of residents in surrounding communities where its PFAS and other toxins were used by failing to provide adequate warnings of the known dangers of such products when discharged into the environment and ingested by nearby residents, such as Plaintiff.

172.    Defendant 3M had a duty to warn users of their PFAS products and other toxins of the dangers of releasing PFAS and other toxins into the environment.

173.    Defendant 3M breached the above-stated non-delegable duty by failing to adequately warn and provide sufficient instructions to purchasers such as Defendants, Solvay,

Arkema, DuPont, Chemours, and John Doe Entities #1-10, to avoid discharging PFAS and other toxins into the environment where it was likely to enter groundwater and be ingested by residents in surrounding communities, including Plaintiff.

174.    As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiff has and will continue to suffer damages.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants jointly and severally, for compensatory, non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count VIII: Strict Liability (Defective Design)

### Plaintiff v. 3M & John Doe Entities #1-10

175.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

176.    Defendant 3M designed, manufactured, and sold PFAS and other toxins that were used at the Chambers Works and West Deptford facilities and elsewhere by Defendants DuPont, Chemours, Solvay, Arkema and John Doe Entities #1-10.

177.    As a manufacturer and seller of PFAS and other toxins, Defendant 3M had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.

178.    Defendant 3M owed that duty to direct users of its products, to reasonably foreseeable users of its products, and also to any person who might reasonably be expected to come into contact with these products, such as Plaintiff.

179.   Defendant 3M's PFAS products and other toxins were used in a reasonably foreseeable manner and without substantial change in the condition of such products and were defective and unfit for their reasonable use.

180.   Defendant 3M knew or should have known that use of its PFAS and other toxins used by Defendants DuPont, Chemours, Solvay, Arkema, and John Doe Entities #1-10 would result in the spillage, discharge, and/or release of PFAS and other toxins into the environment and would contaminate the environment including the groundwater, air, soil, and drinking water of surrounding communities, including Plaintiff's.

181.   Defendant 3M knew or should have known that its PFAS and other toxins would eventually come into contact with and harm residents in surrounding communities, including Plaintiff.

182.   Defendant 3M's PFAS products were defective in design and unreasonably dangerous because, among other things:

a.   PFAS and other toxins cause extensive and persistent contamination when used in a reasonably foreseeable and intended manner; and

b.   PFAS and other toxins' contamination in the environment, including the air, soil, and groundwater, which are the sources of drinking water to citizens in the surrounding communities, including Plaintiff, poses significant threats to their health, safety, and welfare.

183.   At all relevant times, Defendant 3M's PFAS and other toxins which they designed, manufactured, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

184.   The foreseeable risk to public health and welfare, including that of Plaintiff's, posed by Defendant 3M's PFAS and other toxins outweighed the cost to Defendant 3M of reducing or eliminating such risk.

185.   Defendant 3M knew or should have known about reasonably safer and feasible alternatives to PFAS and other toxins.

186.   As a direct and proximate result of Defendant 3M's acts and omissions, Plaintiff has and will continue to suffer injuries and damages.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants jointly and severally, for compensatory, non-compensatory and punitive damages, together with interest, costs, attorneys' fees and all such other relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

## DESIGNATION OF TRIAL COUNSEL

Steven Phillips, Esq. is hereby designated as trial counsel on behalf of Plaintiff.

## CERTIFICATION PURSUANT TO L.CIV.R. 11.2

The undersigned counsel certify that, with the following exceptions, the matter in controversy is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding:

Bond, et al. v. Solvay Specialty Polymers USA, LLC, et al., No. 1:20-cv-08487-NLH-JS

Slusser, et al. v. Solvay Specialty Polymers USA, LLC, et al., No. 1:20-cv-11393-NLH-JS

Deese, et al. v. Solvay Specialty Polymers USA, LLC, et al., No. 1:21-cv-00217-NLH-KW

Corrar v. Solvay Specialty Polymers USA, LLC, et al.,
No. 1:21-cv-00452-NLH-KW

Philipp, et al. v. Solvay Specialty Polymers USA, LLC, et al.
SLM-L-181-21

Albritton v. Solvay Specialty Polymers USA, LLC, et al.
SLM-L-187-21

Allen v. Solvay Specialty Polymers USA, LLC, et al.
SLM-L-198-21

Mesogianes, et al. v. Solvay Specialty Polymers USA, LLC,
et al.
SLM-L-199-21

Giordano, et al. v. Solvay Specialty Polymers USA, LLC et al.
No. 19-cv-21573-NLH-JS

Severa, et al. v. Solvay Specialty Polymers USA, LLC et al.,
No. 20-cv-06906-NLH-JS

NJDEP, et al. v. E. I. Du Pont De Nemours and Company, et al.
No. 2:19-cv-14758-JMV-SCM

NJDEP, et al. v. E. I. Du Pont De Nemours and Company, et al.
No. 1:19-cv-14765-NHL-JS

NJDEP, et al. v. E. I. Du Pont De Nemours and Company, et al.
No. 1:19-cv-14766-RMB-JS

NJDEP, et al. v. E. I. Du Pont De Nemours and Company, et al.
No. 3:19-cv-14767-MAS-ZNQ

The undersigned counsel further certify that we are aware of no other parties who should

be joined in this matter at this time.

PHILLIPS & PAOLICELLI, LLP
Attorneys for Plaintiff

BY:    s/  Steven Phillips
       Steven Phillips, Esq.

**SZAFERMAN LAKIND BLUMSTEIN & BLADER,**
Attorneys for Plaintiff

BY:   s/  Arnold Lakind
      Arnold Lakind, Esq.

BY:   s/  Robert Lytle
      Robert Lytle, Esq.

Dated:  December 29, 2022

# EXHIBIT A



# State of New Jersey
### Department of Environmental Protection
P.O. Box 420
Trenton, New Jersey 08625

PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

CATHERINE R. McCABE
*Commissioner*

IN THE MATTER OF POLY- AND PERFLUOROALKYL
SUBSTANCES (PFAS) GENERATED BY:

SOLVAY SPECIALTY POLYMERS USA, LLC;
SOLVAY SOLEXIS, INC.;
E.I. DU PONT DE NEMOURS & COMPANY;
DOWDUPONT, INC.;
DUPONT SPECIALTY PRODUCTS USA, LLC;
THE CHEMOURS COMPANY FC, LLC;
THE CHEMOURS COMPANY; and,
THE 3M COMPANY

**STATEWIDE PFAS DIRECTIVE,
INFORMATION REQUEST
AND NOTICE TO INSURERS**

This Directive, Information Request, and Notice to Insurers (hereafter, "Directive") is issued pursuant to the authority vested in the Commissioner of the New Jersey Department of Environmental Protection ("Department") by N.J.S.A. 13:1D-1 et seq., the Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 et seq., the Water Pollution Control Act ("WPCA"), N.J.S.A. 58:10A-1 et seq., the Air Pollution Control Act ("APCA"), N.J.S.A. 26:2C-1 et seq., and the Solid Waste Management Act ("SWMA") N.J.S.A. 13:1E-1 et seq., to Solvay Specialty Polymers USA, LLC and its predecessor Solvay Solexis, Inc. (collectively, "Solvay"), E.I. du Pont de Nemours & Company, ("DuPont"), DowDuPont, Inc. ("DowDuPont"), DuPont Specialty Products USA, LLC, The Chemours Company FC, LLC ("Chemours FC, LLC"), The Chemours Company ("Chemours") and The 3M Company ("3M") (collectively, the "Respondents") to notify them that the Department believes them to be responsible for the significant contamination of New Jersey's natural resources, including the air and waters of the State, with poly- and perfluoroalkyl substances ("PFAS"), including perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and perfluorooctanesulfonic acid ("PFOS"), and their replacement compounds, including but not limited to "GenX".

PFAS are being discovered in drinking water, groundwater, surface waters, sediments, soils, air, fish, plants, and other natural resources across New Jersey on a near daily basis. These PFAS compounds constitute a substantial threat to human health and the environment and a statewide public nuisance: they are extremely resistant to degradation and thus persist indefinitely in the environment; they bioaccumulate; they are commonly contained in consumer and household products; and contamination from PFAS is now ubiquitous in New Jersey. While Respondents and their predecessors in interest have understood the toxic characteristics of PFAS for decades, regulatory agencies around the world are only now coming to understand the true nature and dangers of these global contaminants. As further detailed below, the Department has expended and will continue to expend tremendous resources to identify and investigate the presence of PFAS in New Jersey's environment, as well as to monitor, treat, clean up, and/or remove PFAS in impacted areas. As a result, the Department has determined that it is imperative

*The State of New Jersey is an equal opportunity employer. Printed on recycled and recyclable paper.*

# EXHIBIT A

to the protection of public health and safety and the environment of New Jersey that such investigation, monitoring, testing, treatment, cleanup and removal continue, and that Respondents, not New Jersey residents, pay for these activities.

To protect public health and the environment, the Department requires a full understanding of Respondents' historical development, manufacture, transport, use, storage, release, discharge, and/or disposal of PFAS in New Jersey. The Department likewise requires an immediate understanding of Respondents' current development, manufacture, transport, use, storage, release, discharge, and/or disposal of any chemical replacements for PFAS in New Jersey. While these replacement chemicals have been touted as short-chain and having shorter half-lives, some may have similar toxicity and, like their predecessors, they do not break down in the environment and have also been detected in drinking water, groundwater and surface waters in New Jersey. Therefore, the Department is directing that Respondents provide a complete accounting of their historical and current activities with respect to these chemicals in New Jersey.

Under the Spill Act, WPCA, SWMA, and APCA, the Respondents are responsible for PFAS—including PFNA, PFOA, PFOS and their replacement PFAS compounds—that have been discharged or released into New Jersey's air, water and other natural resources, as set forth below.

<u>FINDINGS</u>

A.    <u>PFAS Contamination in New Jersey</u>

PFAS: Contaminants of Emerging Concern

1.  Poly- and perfluoroalkyl substances, collectively referred to as PFAS, are man-made chemicals manufactured and used in the United States since the 1940s. PFAS have fire-resistant properties and act as oil, grease and water repellants. They have been used to make numerous household products, including name brands such as Stainmaster®, Scotchgard®, Teflon®, Gore-Tex®, and Tyvek®. PFOS has long been used in aqueous film-forming foam ("AFFF") used to fight fires. There are literally thousands of PFAS compounds.

2.  PFAS are highly persistent in the environment and are resistant to metabolic and environmental degradation processes. They are also bioaccumulative, resulting in the buildup of these toxins in living tissue. As a result, people exposed to these substances through drinking water or other means accumulate increasing concentrations of PFAS in their blood. Some PFAS are classified as likely human carcinogens. Studies show that exposure to PFAS may cause testicular cancer, kidney and liver cancer, and autoimmune and endocrine disorders in adults as well as developmental effects to fetuses during pregnancy or to breastfed infants. Other associated human health effects include reduced vaccine response, and increased cholesterol and liver enzymes.

3.  DuPont and 3M knew of the health and environmental impacts of PFAS for decades but continued to use them in products and to release them into the environment. 3M knew that PFOA and PFOS were harmful to people and the environment, including based on its own studies from as early as the 1970s. 3M also knew that the chemicals could leach into groundwater and contaminate the environment. DuPont knew for decades that PFOA was toxic, including through studies of its own workers. DuPont also knew that PFOA was being discharged into the environment, but failed to disclose the risks to regulators or the public. Likewise, through its membership in an industry

2

trade group that conducted toxicology studies on PFNA in the 2000s, Solvay knew or should have known of the adverse effects of PFNA exposure.  Solvay knew that it was discharging large amounts of PFNA into the environment from their West Deptford, New Jersey facility at least as early as 1991.

4. The United States Environmental Protection Agency ("EPA") has identified PFAS as "emerging contaminants," which are currently unregulated at the federal level.  In 2009, EPA issued preliminary health advisory values for PFOA and PFOS in drinking water of 400 parts per trillion ("ppt") and 200 ppt, respectively. In 2016, EPA reduced its advisories for the chemicals in drinking water to 70 ppt, combined.  Other federal agencies have suggested drinking water values should be much lower.  Then, in 2018, the U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released draft minimum risk levels—the amount of a chemical a person can eat, drink or breathe each day without a detectable risk to health—for PFOA and PFNA equivalent to 21 ppt, and for PFOS 14 ppt.

A.   Regulation of PFNA, PFOA and PFOS.

5. In the absence of action at the federal level to meaningfully regulate these contaminants of emerging concern, New Jersey has acted to protect its citizens and environment and to regulate PFNA, PFOA and PFOS, including by seeking to establish Maximum Contaminant Levels ("MCLs") and Groundwater Quality Standards ("GWQS") for these chemicals, and to add these chemicals to the Department's List of Hazardous Substances at N.J.A.C. 7:1E-Appendix A, as well as taking other necessary actions.

6. The New Jersey Drinking Water Quality Institute ("DWQI") is established pursuant to the Safe Drinking Water Act ("SDWA"), N.J.S.A. 58:12A-1 et seq.  It is an advisory body that, among other items, provides the Department with maximum contaminant level recommendations for New Jersey-specific drinking water contaminants.

7. The Department establishes MCLs at N.J.A.C. 7:10 pursuant to the SDWA to protect the public against consumption of drinking water contaminants that present a risk to human health.  N.J.S.A. 58:12A-13(b).  MCLs apply to public community and public non-community water systems, which are required to monitor for contaminants for which MCLs have been established, and to take actions to reduce contaminant levels or other appropriate actions when there is an exceedance of the MCL.

8. GWQS are set forth at N.J.A.C. 7:9C and are implemented as limits on discharges to groundwater pursuant to the New Jersey Pollutant Discharge Elimination System (NJPDES) rules, N.J.A.C. 7:14A, and as groundwater remediation standards, N.J.A.C. 7:26D-2.2(a).

9. In July, 2015, DWQI recommended to the Department that an MCL for PFNA of 13 ppt be established, and on November 25, 2015, the Department established an interim GWQS for PFNA of 10 ppt pursuant to N.J.A.C. 7:9C-1.7(c).

10. In March 2017, after public comment and a vote, DWQI recommended to the Department that an MCL for PFOA of 14 ppt be established.

11. In November 2017, after public comment and a vote, DWQI recommended to the Department that an MCL for PFOS of 13 ppt be established.

3

12. On January 16, 2018, the Department adopted a specific GWQS for PFNA of 10 ppt and added PFNA to the Department's List of Hazardous Substances (see 50 N.J.R. 334(a)).

13. On September 4, 2018, consistent with the recommendation of DWQI, the Department adopted an MCL for PFNA of 13 ppt (see 50 N.J.R. 1939(a)).

14. On January 17, 2019, the Department solicited public input and posted on its website technical documents in support of its draft Interim Specific Groundwater Quality Criteria for PFOA and PFOS of 10 ppt. *See* https://www.nj.gov/dep/dsr/ISGWQC_Public_Comment_PFOS_PFOA.html.

15. On March 13, 2019, the Department established interim specific groundwater quality criteria for PFOA and PFOS of 10 ppt, pursuant to N.J.A.C. 7:9C-1.7(c). *See* https://nj.gov/dep/wms/bears/gwqs.htm. These interim specific criteria became effective on posting to NJDEP's website, and will remain in effect until replaced with specific criteria. N.J.A.C. 7:9C-1.7(c)(ii).

16. The Department has submitted to the Office of Administrative Law a notice of proposed rule amendments concerning PFOA and PFOS, which is anticipated to be published in the New Jersey Register on April 1, 2019. The Department will propose amending the Safe Drinking Water Act rules establishing MCLs for PFOA of 14 ppt and for PFOS of 13 ppt; establishing groundwater quality criteria standards for PFOA of 14 ppt and PFOS of 13 ppt; and adding PFOA and PFOS to the List of Hazardous Substances.

B.    **PFAS Contamination in New Jersey**

17. The Department's first statewide occurrence study of PFAS in drinking water in 2006, which focused on PFOA and PFOS near facilities that used, handled, stored and/or manufactured PFOA and/or other chemicals, revealed that, out of the 23 drinking water sources sampled, PFOA and PFOS were detected in 65-percent and 30-percent of the systems tested, respectively.

18. In order to gain further knowledge on the occurrence of PFOA, PFOS and other PFAS in New Jersey's drinking water sources, the Department initiated a second occurrence study in 2009 and early 2010. The results of this second occurrence study revealed that, out of 33 drinking water samples from 20 of New Jersey's 21 counties, between one and eight PFAS compounds were detected in 70-percent of the samples. In the samples tested, PFOA was detected in 57-percent (up to 100 ppt), PFOS was detected in 30-percent (up to 43 ppt), and PFNA was found at the highest reported level in drinking water anywhere in the world, at 96 ppt.

19. The Department is continuing to study PFAS compounds and their impact on New Jersey's environment. In 2018, the Department performed an assessment of 13 PFAS compounds in the ecosystems of 11 waterways across New Jersey, which included analyzing surface water, sediment and fish tissue samples. The results of this study revealed all surface water samples and most sediment samples to have multiple PFAS compounds. Fish from all waterbodies also contained PFAS compounds, resulting in the need for the Department to issue more restrictive fish consumption advisories for 10 of these sites.

20. As of March 19, 2019, 564 of 1,069 public water systems (53-percent) have reported the results of PFAS sampling under N.J.A.C. 7:10-5. 70 public water systems not previously identified through

other sampling events – 12-percent of the public water systems reporting – reported levels at or above the recommended MCL for PFNA, PFOA, PFOS, or a combination of the three. Prior to the first quarter monitoring required by N.J.A.C 7:10-5 described above, another 46 water systems reported levels at or above the recommended MCLs for PFNA, PFOA, PFOS or a combination of the three.

21. The Department has also sampled for PFAS as part of remedial investigations in specific locations around the State, including 992 private wells sampled as of June 2018. Through this targeted effort, the Department has detected PFOA in 427 private wells – or 43-percent of the wells sampled – and 284 private wells were found to have levels of PFOA exceeding the proposed MCL. PFOS was found in 304 private wells – or 31-percent of the private wells tested – with detections at 40 wells above the proposed PFOS MCL. As of April 3, 2018, out of the 400 wells sampled as part of the remedial investigation emanating from Solvay's site, 83 wells – 21-percent – required installation of a point of entry treatment ("POET") system for PFNA or PFOA.

C.   **Responsible Parties**

22. Respondents are responsible for the significant PFAS contamination across New Jersey and the costs the Department has incurred, and will incur, responding to this threat to public health, safety and the environment.

  **1. Solvay**

23. Solvay Specialty Polymers USA, LLC (and its predecessor Solvay Solexis, Inc.) (collectively "Solvay") is a Delaware Corporation with its principal place of business at 10 Leonard Lane, West Deptford, New Jersey.

24. Solvay (formerly known as Ausimont USA, Inc.) has been the owner and operator of a manufacturing facility located at 10 Leonard Lane and Crown Point Road, Block 328, Lots 1.01 and 1.07 on the tax maps of West Deptford Township, Gloucester County, from 1990 to the present (the "Solvay Site"). From approximately 1990 to 2012, Solvay manufactured polyvinylidene fluoride ("PVDF") at this facility, which is a specialty plastic that is utilized in conjunction with lithium batteries, medical and defense uses, semi-conductors, or other instances when a higher level of purity is required. During most of this time, Surflon S-111 was used in the manufacturing process for PVDF. Surflon S-111 is composed of approximately 74% PFNA. Solvay's facility was considered to have the second highest capacity in the world for purposes of using Surflon S-111 to make PVDF. As a result of Solvay's operations at the facility, it discharged massive amounts of the Surflon S-111 (primarily, PFNA) into the surrounding air and water. The site, off-site properties, and New Jersey's natural resources, including air, surface waters, groundwater, and drinking water sources, are contaminated with PFNA.

25. Additionally, Solvay also used sodium perfluorooctanoate (NaPFO) as a surfactant at its facility. The NaPFO (which is a salt of PFOA) was supplied to Solvay by 3M. NaPFO degrades into PFOA. The site and surrounding area are also contaminated with PFOA as a result of Solvay's activities at the facility.

26. As of March 19, 2019, out of the 400 wells sampled as part of the remedial investigation around the Solvay Site, 83 wells – 21-percent – required installation of a POET system for PFNA or PFOA.

5

27. Currently, Solvay is using a replacement chemical for PFNA for use in the manufacture of its polyvinylidene product. This compound, identified in Wang, 2013, as "Solvay's product" (CAS No. 329238-24-6) is a chloro perfluoro polyether carboxylate and has been identified in environmental matrices in Salem and Gloucester Counties.

### 2. DuPont / DowDuPont

28. DuPont is a Delaware Corporation with its principal place of business in Wilmington, Delaware. DowDuPont is a Delaware Corporation with its principal place of business in Wilmington, Delaware.

29. DuPont owned and operated Chambers Works, 67 Canal Road and Route 130, located in Pennsville and Carneys Point Townships, Salem County, from 1891 to 2015. PFOA was used at Chambers Works beginning in the late 1950s. At varying times PFOA was used to, among other things, manufacture fluoroelastomers, perfluoroelastomers and specialty fluoroelastomers used in a variety of consumer and other products for their chemical non-stick and heat-resistant properties. Telomers were also used and manufactured at Chambers Works, and PFOA is a by-product of the telomer manufacturing process. DuPont also accepted large quantities of PFOA-containing waste from off-site facilities, including its Washington Works facility in Parkersburg, West Virginia, and discharged this waste along with wastewater from its on-site PFOA-related processes through its wastewater treatment plant. As a result of the above, DuPont has discharged PFOA as well as other PFAS, including PFNA, from Chambers Works for decades, which has contaminated the site and the surrounding area.

30. As set forth below, DuPont spun-off its "performance chemicals" business lines (including Teflon and various other products associated with PFAS constituents) by creating Chemours on July 1, 2015. As part of a series of related transactions, DuPont also transferred its Chambers Works property to Chemours FC, LLC at that time. Nonetheless, DuPont continued to operate an industrial facility on the Chambers Works property, manufacturing aramids and fluoroelastomers on a portion of the Chemours Chambers Works site pursuant to an industrial lease (whereby DuPont was the tenant and Chemours FC, LLC was the landlord). In March of 2018, DuPont announced that would cease production of aramids on its Chambers Works leasehold but that it would continue to produce fluoroelastomers on the Site.

31. With respect to the area surrounding Chambers Works, sampling of residential drinking water wells in the area has revealed contamination at least five miles away from the facility. In total, 341 individual drinking water wells have been sampled, and 168 have exceeded applicable screening criteria, based on the concentrations of PFOA, PFNA, or PFOA and PFOS combined. GenX was also detected in residential drinking water. Investigation of contamination in this area, aside from these selected wells, remains necessary in order to fully assess impacts to groundwater, surface water, soils, sediments and biota.

32. Additionally, DuPont has been the owner and operator of its Parlin Facility, located at 250 Cheesequake Road, Sayreville Borough, Middlesex County since 1904. Currently, some or all of the facility is owned by another DuPont entity, DuPont Specialty Products USA, LLC. Beginning in the late 1970s, DuPont blended fluoropolymers at its Parlin facility, and produced Teflon® finishes. As a result of these activities PFOA was released into the environment from the facility. In 2006 and 2007, DuPont discovered PFOA releases, both on-site and off-site. Among other things, those releases have contaminated groundwater, including off-site. In an email dated February 4, 2019,

6

DuPont provided sampling results to the U.S. Environmental Protection Agency and the Department of sampling conducted in several groundwater monitoring wells at the DuPont Parlin facility. Those results show that GenX was detected in several groundwater monitoring wells at the DuPont Parlin facility. Also, previous sampling of finished water at the Perth Amboy Wellfield has documented the presence of PFOA at concentrations both above and below the Department's Interim Specific Ground Water Quality Standard (ISGWQS) of 10 ppt; individual supply wells may exceed the PFOA ISGWQS. The Perth Amboy Wellfield is located approximately one and a half miles south of the Parlin facility.

33. DuPont also manufactured PFOA in North Carolina that was then transported, used, disposed of, or discharged in New Jersey, further making it in any way responsible for such contamination. After 3M decided to stop manufacturing PFOA due to its toxicity, DuPont began producing its own feedstock of the chemical in 2002. DuPont manufactured PFOA until replacing it with GenX. DuPont manufactured and utilized GenX until transferring its performance chemicals business and liabilities to Chemours.

34. In 2017, DuPont merged into a direct subsidiary of DowDuPont, Inc., becoming owned and controlled by DowDuPont. DowDuPont is restructuring and moving the vast majority of the assets of DuPont to itself and other entities, which it will spin off into independent, publicly traded entities. These transactions, along with the transfer of the Parlin Site to DuPont Specialty Products USA, LLC and the Industrial lease at Chambers Works, may trigger the requirements of the Industrial Site Recovery Act, N.J.S.A. 13:1K-6, et seq. ("ISRA"), which would require the establishment of an appropriate remediation funding source, among other requirements.

3. The Chemours Entities

35. The Chemours Company is a Delaware Corporation with its principal place of business in Wilmington, Delaware. The Chemours Company FC, LLC is a Delaware Limited Liability Company with its principal place of business in Wilmington, Delaware.

36. In 2013, confronted with mounting PFAS liabilities, DuPont announced its plans to spin off its performance chemicals business into a separate publicly traded company, Chemours. In order to effectuate the spin off and transfer of certain assets and liabilities, a number of corporate entities were created. In 2014, Chemours FC, LLC was created. In 2015, DuPont transferred ownership of the Chambers Works property to Chemours FC, LLC. Following the spin-off, Chemours FC, LLC became a subsidiary of Chemours. Chemours FC, LLC remains the owner of the Chambers Works property, while Chemours operates the site. The Chemours transactions may have also triggered the requirements of ISRA, which would require the establishment of an appropriate remediation funding source, among other requirements.

37. Chemours FC, LLC, as well as Chemours, accepted the transfer of Chambers Works knowing that the site was contaminated with PFOA and other PFAS, that PFAS was discharged at the site, that there was PFAS contamination in the surrounding area, that remediation of the site and the surrounding area would be required as a result of this contamination, and that funds would need to be available for the same.

38. Additionally, since Chemours FC, LLC became the owner and Chemours the operator of Chambers Works, PFOA and other PFAS continue to be discharged at the site.

7

39. Further, Chemours has agreed to assume certain liabilities of DuPont's with respect to PFOA and other PFAS.

40. Currently, Chemours is using PFAS replacement chemicals, including GenX technology and associated chemicals hexafluoropropylene oxide dimer acid (HFPO-DA) and its ammonium salt, in its manufacturing processes for Krytox® at Chambers Works. As a result of this process, HFPO-DA is discharged into New Jersey's water and emitted into New Jersey's air.

41. HPFOA-DA has been detected in residential drinking water wells surrounding Chambers Works.

    4. The 3M Company

42. 3M is a Delaware Corporation with its principal place of business in St. Paul, Minnesota.

43. 3M is a person in any way responsible for PFOA and PFOS discharged in New Jersey as the primary manufacturer of PFOA, which it supplied to DuPont, Solvay and others, and PFOS, which were both discharged across New Jersey's environment.

44. 3M has been identified by the United States EPA as the dominant global producer of PFOA and related chemicals, manufacturing approximately 85 percent or more of total worldwide volumes of PFOA. 3M supplied PFOA to DuPont for use in its manufacturing processes until at least the early 2000s. DuPont discharged this PFOA in New Jersey, including at Chambers Works and its Parlin facility, resulting in contamination of New Jersey's environment. 3M also supplied NaPFO to Solvay, which it discharged in New Jersey's environment.

45. 3M was also a primary manufacturer of PFOS, and produced AFFF containing PFOS and PFAS. 3M sold AFFF from the 1960s to the early 2000s, which was used at military bases, airports and firefighting training facilities.

46. Use of AFFF in New Jersey has discharged PFOS and other PFAS into New Jersey's environment. For example, AFFF use at Joint Base McGuire-Dix-Lakehurst and FAA William J. Hughes Technical Center has resulted in significant contamination of surrounding drinking water sources and natural resources. The Department's efforts to identify sites where AFFF was used is ongoing.

D.   New Jersey PFAS-Related Costs.

    Costs Previously Incurred by the Department

47. As of March 4, 2019, the Department has incurred at least $3,105,084.91 to investigate, monitor, test, treat, remediate, clean up and remove PFNA and PFOA from the area surrounding Solvay's facility in West Deptford. And, the Department continues to incur costs associated with PFNA and PFOA on a daily basis.

48. The above-referenced costs do not include all costs previously incurred by the Department, and will be supplemented. Among other things, the Department may seek reimbursement from Respondents for its statewide studies of the occurrence of PFAS and related research and the cost of the Division of Science & Research's labor on PFAS studies.

**Future Costs to be Incurred by the Department**

49. The Department expects to incur hundreds of millions of dollars in costs assessing and responding to the discharge of PFAS into the environment of New Jersey.

50. The Department anticipates incurring additional costs related to ongoing and new studies and research projects to further assess the impacts of PFAS on groundwater, surface waters, marine and freshwater fish and other aquatic life, biota, and human health.

51. The Department anticipates incurring costs to investigate, monitor, test, treat, remediate, clean up and remove PFNA, PFOA and PFOS from New Jersey's drinking water and waste water systems.

52. The Department anticipates incurring costs to investigate, monitor, test, treat, remediate, clean up and remove PFNA, PFOA and PFOS from New Jersey's private drinking water wells.

53. The Department anticipates incurring costs to investigate, monitor, test, treat, remediate and clean up and remove PFNA, PFOA and PFOS from New Jersey's natural resources, including groundwater, surface water, soil, sediments and biota.

54. The above list of future costs the Department anticipates incurring is not exhaustive. Rather, this list is meant to provide a framework for estimating future costs related to PFNA, PFOA and PFOS for the purposes of establishing a funding source for these costs to be maintained by Respondents.

<u>DIRECTIVE</u>

55. The Department is broadly empowered to take appropriate action to prevent the pollution of New Jersey's environment and abate nuisances in connection therewith. N.J.S.A. 13:1D-9(e). The Department is also charged with enforcing New Jersey's environmental laws, including the Spill Act, the WPCA, the SWMA, and the APCA. The Department may direct persons to post a performance bond or other security for the full estimated cost to correct violations of New Jersey's environmental laws. N.J.S.A. 13:1D-9(u).

56. The substances referenced in the paragraphs above are hazardous substances pursuant to the Spill Act, N.J.S.A. 58:10-23.11(b), pollutants pursuant to the WPCA, N.J.S.A. 58:10A-3(n), solid waste pursuant to the SWMA, N.J.S.A. 13:1E-3(a) and air contaminants pursuant to the APCA, N.J.S.A. 26:2C-2.

57. The Department is authorized to seek and obtain information from persons related to discharges or potential discharges of pollutants into the waters of the State, discharges of hazardous substances, disposal of solid waste, and releases of air contaminants. Pursuant to the WPCA, the Department is empowered to assess a person's compliance with the Act, and may request from any person who has information relevant to discharges of pollutants to provide certain documents and/or information to the Department. N.J.S.A. 58:10A-5(a)-(b), -10.3(a). Additionally, pursuant to the Spill Act, persons who may be subject to liability for discharges must immediately notify the Department of same. N.J.S.A. 58:10-23.11e. Further, pursuant to the APCA, the Department is empowered to require the filing of reports concerning information related to emissions, and

9

persons who cause a release of air contaminants which pose a potential threat to the public health, welfare or the environment are obligated to immediately notify the Department of same. N.J.S.A. 26:2C-9(b)(3), -19(e).

58. Further, pursuant to the Spill Act, when a hazardous substance is discharged, the Department may act in its discretion to clean up and remove or arrange for the cleanup and removal of the discharge or may direct the discharger to clean up and remove, or arrange for the cleanup and removal of, the discharge. N.J.S.A. 58:10-23.11f.a(1). The Department is authorized to direct a responsible party to pay for the cleanup and removal of the discharge prior to the Department cleaning up and removing or arranging for the cleanup and removal of the discharge. The Department is also authorized to seek compensation for damages incurred by all parties injured by these discharges. N.J.S.A. 58:10-23.11u.b. Any discharger that fails to comply with a directive shall be liable to the Department in an amount equal to three times the cost of such a cleanup and removal, and shall be subject to the revocation or suspension of any license issued or permit held authorizing that person to operate a hazardous waste facility or solid waste facility. N.J.S.A. 58:10-23.11f.7.a(1).

59. Pursuant to N.J.S.A. 58:10-23.11g.c. any person who has discharged a hazardous substance or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the Department.

60. Pursuant to N.J.S.A. 58:10-23.11g.c., Respondents are or will be persons who discharged a hazardous substance or are in any way responsible for the discharge of a hazardous substance.

61. Respondents are persons whom the Department believes have, or may have, information relevant to a discharge or potential discharge of hazardous substances and pollutants, the disposal of solid waste and the release of air contaminants in a quantity or concentration which poses a potential threat to public health, welfare or the environment.

62. In accordance with the above, the Department hereby directs Respondents to take the following actions.

**Payment of Previously Incurred Costs**

63. Solvay, within 30 days after receipt of this Directive, shall reimburse the Department for the Department's previously incurred costs to investigate, treat, cleanup and remove PFNA, PFOA and other PFAS at and the area around its West Deptford facility, as recounted in paragraph 47 and 48 above. Solvay shall pay $3,105,084.91 to the Department as reimbursement for the currently calculated past costs incurred.

64. The Department hereby directs Solvay to assume responsibility for operation and maintenance of all of the POETs installed to address PFNA associated with the Solvay Site by taking the following actions according to the following expedited site-specific timeframes, established pursuant to N.J.A.C. 7:26C-3.4. Note the timeframes specified herein do not represent an extension to any past due timeframes and the Department reserves the right to pursue penalties back to the original due dates:

10

a. Solvay shall maintain a licensed site remediation professional for the remediation of the entire Solvay Site, pursuant to N.J.A.C. 7:26C-2.3(a)2;

b. Solvay shall assume the monitoring and maintenance of the POET Systems at the Solvay Site pursuant to N.J.A.C. 7:26C-2.3, including but not limited to the following:

1) As first priorities, Solvay shall conduct the following:

i) Within ninety (90) days after receipt of this Directive, assume operation and maintenance of the POETs installed by the Department at the following locations to address PFNA contamination associated with the Solvay Site:

West Deptford Township, Gloucester County
1)    Block 128, Lot 2, 1692 Crown Point Road; and
2)    Block 351, Lot 8.03, 963 Kings Highway; and
3)    Block 351, Lot 8.01, 965 Kings Highway.; and
4)    Block 346.07, Lot 21.02, 643 Mantua Grove Road; and
5)    Block 346.07, Lot 21.05, 639 Mantua Grove Road; and
6)    Block 358, Lot 6.02, 667 Mantua Pike.; and
7)    Block 350.03, Lot 45, 1043 Kings Highway, and
8)    Block 346.07, Lot 21.01, 619 Mantua Grove Road, and
9)    Block 325, Lot 7.02, 1752 Crown Point Road, and
10)   Block 353, Lot 1.03, 350-352 Parkville Station Road, and
11)   Block 354, Lot 1.03, 1098 Jessup Road, and

Greenwich Township, Gloucester County
12)   Block 253, Lot 5, Greenwich Lake Park; and
13)   Block 263, Lot 3, 665 Swedesboro Road, and
14)   Block 263, Lot 4, 625 Swedesboro Road, and
15)   Block 255, Lot 1, 631 Swedesboro Road, and
16)   Block 255, Lot 4, 656 Swedesboro Road, and
17)   Block 261, Lot 4, 465 Swedesboro Road, and
18)   Block 249, Lot 1, 405 Tomlin Station Road, and
19)   Block 358, Lot 6, 671 Mantua Pike, and

Logan Township, Gloucester County
20)   Block 2801, Lot 8, 284 Pedricktown Road, and
21)   Block 2801, Lot 8, 286 Pedricktown Road, and
22)   Block 2801, Lot 8, 288 Pedrickton Road, and
23)   Block 2801, Lot 8, 290 Pedricktown Road, and
24)   Block 2801, Lot 14, 300 Pedricktown Road, and
25)   Block 43, Lot 8, 288 Floodgate Road, and

26)   Block 2304, Lot 5, 2510 Oldmans Creek Road, and
27)   Block 501, Lot 28.02, 548 Route 44, and
28)   Block 1003, Lot 11, 676 Oak Grove Road, and
29)   Block 101, Lot 7, 104 Route 130, and
30)   Block 2706, Lot 48, 2251 Township Line Road, and
31)   Block 3103, Lot 10, 42 Jackson Street, and
32)   Block 1303, Lot 8, 32 Jackson Street, and
33)   Block 3103, Lot 9, 36 Jackson Street, and

Swedesboro Borough, Gloucester County
34)   Block 2, Lot 15, 320 Floodgate Road, and Oldmans, Salem County
35)   Block 11, Lot 7.01, 59 South Railroad Avenue, and
36)   Block 11, Lot 7.03, 67 S. Railroad Avenue, and
37)   Block 3, Lot 13, 187 N. Railroad Avenue, and
38)   Block 28.01, Lot 61, 22 Seminole Lane, and
39)   Block 28.01, Lot 35, 171 Straughns Mill Road, and
40)   Block 28.01, Lot 37, 157 Straughns Mill Road.

ii)   Within ninety (90) days after receipt of this Directive, assume operation and maintenance of the thirty (30) POETs installed by the Department at the following locations to address PFOA contamination associated with the Solvay Site:

Logan Township, Gloucester County
41) Block 502, Lot 5, 43 Floodgate Road
42) Block 605, Lot 8, 139 Repaupo Station Road
43) 605, Lot 17.01, 204 Repaupo Road
44) Block 1003, Lot 13.01, 738 Oakgrove Road
45) Block 1003, Lot 12.01 736 Oak Grove Road
46) Block 1003, Lot 3.01 82 Coontown Road
47) Block 11102, Lot 22, 2789 Route 322
48) Block 2801, Lot 11, 304 Pedricktown Road
49) Block 1102, Lot 21, 2799 Route 322
50) Block 3102, Lot 1, 133 Route 130
51) Block 3102, Lot 9, 139 Route 130
52) Block 3102, Lot 3, 2537 Center Square Road
53) Block ___, Lot___, 137 Route 130 [To Be Updated]
54) Block 3101, Lot 10, 42 Jackson Street
55) Block 1301, Lot 8, 32 Jackson Street
56) Block 3103, Lot 9, 36 Jackson Street
57) Block 3103, Lot 7, 26 Jackson Street

12

Swedesboro Borough, Gloucester County
58) Block___, Lot___, 324 Floodgate Road (To Be Updated)

Greenwich, Gloucester County
59) Block 255, Lot 1.01, 641 Swedesboro Road

Oldman's Township, Salem County

60) Block 2801, Lot 56, 16 Pedricktown-Woodstown Road
61) Block 28.01, Lot 60, 18 Seminole Lane
62) Block 28.01, Lot 59, 6 Seminole Lane
63) Block 3, Lot 13, 191A North Railroad Avenue
64) Block 29, Lot 8.01, 158 Straughns Mill Road
65) Block 28.01, Lot 10, 52 Pedricktown-Woodstown Road
66) Block 28, Lot 27, 80 Tighe Road
67) Block 29, Lot 8.02, 162 Straughns Mill Road
68) Block 28, Lot 27.04, 379 Perkintown Road
69) Block 28.01, Lot 54, 24 Seminole Lane
70) Block ___, Lot___, 178 Pedricktown-Woodstown Road [TO BE UPDATED]

    c)    Within ninety (90) days after receipt of this Directive identify and sample all potable wells within 500 feet down gradient, 500 feet side gradient and 250 feet up gradient of each previously identified impacted potable well, pursuant to N.J.A.C. 7:26E-1.11.

    d)    Within one hundred twenty (120) days after receipt of this Directive implement treatment and monitoring, in accordance with N.J.A.C. 7:26E-1.11, for potable wells with documented exceedances of the 13 ppt PFNA MCL attributable to the Site, and/or with documented exceedances of the 14 ppt action level for PFOA.

65. Solvay shall submit an updated Remediation Cost Review and Remediation Funding Source/Financial Assurance Form to include the cost of additionally required potable sampling and implementation of treatment and monitoring.

66. Payments made pursuant to paragraphs 47, 48 and 63 above shall be made by certified check or cashier's check payable to "Treasurer, State of New Jersey" and mailed to:

Division of Revenue and Enterprise Services
P.O. Box 417
Trenton, New Jersey 08646-0417

With a copy to:

Catherine R. McCabe
Commissioner
New Jersey Department of Environmental Protection
401 East State Street
Trenton, New Jersey 08625

**Funding of Future Costs of Investigation, Treatment, Cleanup and Removal, and Liability of the Spill Fund**

67. Respondents, within 30 days of receipt of this Directive, shall meet collectively with the Department to discuss a good faith estimate for future costs to investigate, test, treat, cleanup, and remove PFNA, PFOA, and PFOS from New Jersey's environment and discuss Respondent's establishment of funding sources for same. Future costs include, but are not limited to:

   a. The Department's continued studies and research on the presence of PFAS in New Jersey's environment, as referenced above in paragraphs 49 to 54;

   b. Costs to investigate, test, treat, remediate, clean up and remove PFNA, PFOA and PFOS from New Jersey's drinking water systems and waste water systems; ·

   c. Costs to investigate, test, treat, remediate, clean up and remove PFNA, PFOA and PFOS from New Jersey's private drinking water wells and irrigation wells;

   d. Costs to investigate, test, treat, remediate and clean up and remove PFNA, PFOA and PFOS from New Jersey's natural resources, including air, groundwater, surface water, soil, sediments and biota;

   e. Costs of assessment, replacement, restoration and compensation for all injured natural resources, including but not limited to, all lost use and value and ecological injury;

   f. All damages incurred by persons other than the State who are injured by the conduct of Respondents and recoverable by the Department on their behalf;

   g. All damages and economic impacts incurred by the State as a result of the conduct of Respondents; and

   h. All liabilities and damages incurred by the Spill Fund as a result of the conduct of Respondents.

**Information Related to Historic Use of PFNA, PFOA and PFOS, and Current Use of Replacement Chemicals**

68. Each Respondent, as applicable, within 21 days of receipt of this Directive, shall provide the following information to the Department regarding its historic use of PFNA, PFOA and/or PFOS in New Jersey:

   a. Identify all PFNA, PFOA and PFOS manufactured, supplied, transported, stored, used, treated, disposed, and/or discharged in New Jersey;

14

    b.   Identify the nature, extent, source and location of discharges of PFNA, PFOA and PFOS into the waters of the State;

    c.   Identify the nature, extent, source and location of emissions of PFNA, PFOA and PFOS into air;

    d.   If the Respondent is not the manufacturer, supplier, or transporter of PFNA, PFOA and PFOS, identify any such manufacturer, supplier or transporter; and

    e.   The Respondent's ability to pay for, or perform, the cleanup and removal of PFNA, PFOA and PFOS from New Jersey's environment, and every "change of ownership" (as defined in N.J.S.A. § 13:1K-8) involving Respondents' current or former sites in New Jersey.

69. Each Respondent, as applicable, within 21 days of receipt of this Directive, shall provide the following information to the Department regarding its use of PFAS replacement chemicals (i.e., those short-chain PFAS chemicals used in any manufacturing process as a replacement for PFNA, PFOA and/or PFOS) in New Jersey:

    a.   Identify all replacement chemicals manufactured, transported, stored, used, treated, disposed, and/or discharged in New Jersey, and the toxic characteristics of any such chemicals;

    b.   Identify the nature, extent, source and location of discharges of replacement chemicals into the waters of the State;

    c.   Identify the nature, extent, source and location of emissions of replacement chemicals into air;

    d.   If the Respondent is not the manufacturer or transporter of the replacement chemicals, identify any such manufacturer or transporter; and

    e.   The Respondent's ability to pay for, or perform, the cleanup and removal of replacement chemicals from New Jersey's environment.

70. Each Respondent, as applicable, in responding to the above-referenced information requests, must conduct a diligent search of its records and make reasonable inquires of its employees, and further has the continuing obligation to supplement such information if additional relevant information is discovered, or if it determines information previously provided to the Department was false, inaccurate or misleading.  N.J.S.A. 58-10A-10.3c(1)-(2).

71. For the avoidance of doubt, this Directive is not a formal enforcement order, a final agency action or a final legal determination that a violation has occurred.  This Directive is not subject to pre-enforcement review and may not be appealed or contested.

<u>NOTICE</u>

72. Failure to comply with this Directive and Notice to Insurers will increase Respondents' potential liability to the Department in an amount equal to three (3) times the cost of arranging for the cleanup and removal of the discharge and may cause a lien to be placed on Respondents' real and

15

personal property pursuant to the Spill Act, N.J.S.A. 58:10-23.11f., including a first priority lien on the properties where the discharge(s) have occurred.

73. Pursuant to N.J.S.A. 58:10-23.11u., N.J.S.A. 58:10A-10, N.J.S.A. 26:2C-9, and N.J.S.A. 13:1E-9, the Department may require through a court action compliance with the Spill Act, WPCA, APCA, and SWMA. Failure by Respondents to comply with this Directive may result in an enforcement action by the Department, which will subject each Respondent to penalties of up to $50,000 per day and each day of violation constitutes an additional, separate and distinct violation.

## RESERVATION OF RIGHTS

74. The Department reserves the right to direct Respondents to take or arrange for the taking of any additional remediation that the Department determines to be necessary to protect the public health and safety and/or the environment and to seek full reimbursement and treble damages for all costs incurred in taking such additional remediation if Respondents fail to comply with the applicable provisions of this Directive.

75. The Department reserves all rights and remedies under the Spill Act, WPCA, SWMA and APCA as well as all other applicable statutes not set forth herein and the common law of New Jersey, including its right to bring an action in the Superior Court for appropriate relief.

## NOTICE TO INSURERS

76. Pursuant to N.J.S.A. 58:10-23.11s, any claims for costs of cleanup or damages by the State may be brought directly against the bond, insurer or any other person providing evidence of financial responsibility, and Respondents are directed to put their insurers on notice of such.

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION

DATE: March 25, 2019          By:

Catherine R. McCabe, Commissioner

16